NOT DESIGNATED FOR PUBLICATION

No. 121,644

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SARA MINGES,
*Appellant*,

v.

KANSAS BEHAVIORAL SCIENCES REGULATORY BOARD,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARY E. CHRISTOPHER, judge. Opinion filed May 29, 2020. Affirmed.

*John G. Schultz*, of Franke Schultz & Mullen, P.C., of Kansas City, Missouri, for appellant.

*Jane E. Weiler*, assistant attorney general, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: Sara Minges appeals from the district court's decision affirming the final order issued by the Kansas Behavioral Sciences Regulatory Board (Board), which upheld the administrative law judge's decision to suspend Minges' license to practice as a Licensed Professional Counselor (LPC). Minges argues that the Board's findings of unprofessional conduct under K.A.R. 102-3-12a(b) were not supported by substantial evidence in light of the record as a whole and were otherwise unreasonable, arbitrary, and capricious. We disagree and, for the reasons stated below, affirm the Board's decision.

FACTS

Minges earned a bachelor of arts degree in psychology from the University of Tennessee and a master of science degree in counseling psychology from Avila University. In 2008, Minges completed a play therapy certification program from the Kansas City Play Therapy Institute. Play therapy involves art, music, and meditation for children, teens, and adults who suffer from mental health issues. That same year, Minges was licensed as an LPC in Kansas. An LPC is not licensed to practice independently but is required to practice under the direction of a clinical level professional. See K.S.A. 65-5802(g). In 2009, Minges opened a private practice named Playful Awareness. Minges was the owner and sole employee; she personally handled all billing and communication with clients.

In 2011, the Board filed a petition in discipline against Minges' license to practice. The matter was resolved through a consent agreement and order.

In 2012, the Board received three complaints against Minges. The Board ultimately dismissed the complaints but issued a formal censure against Minges that recommended "more professional collaboration with colleagues to achieve less conflict in future professional relationships."

The Board received four additional complaints against Minges in 2014 and 2015. After the Board filed a petition in discipline against Minges, she requested a formal hearing before the Board. An administrative law judge (ALJ) was designated to preside over the formal hearing. See K.S.A. 77-514(a) (presiding officer may be agency head, one or more members of agency head, an administrative law judge assigned by office of administrative hearings, or, unless prohibited by K.S.A. 77-551, one or more persons designated by agency head). Following the hearing, the ALJ issued an initial order concluding that Minges' actions constituted unprofessional conduct as defined by the

2

Kansas Professional Counselors Licensure Act, K.S.A. 65-5801 et seq. See K.A.R. 102-3-12a(b). Minges requested review of the ALJ's initial order by the Board. The Board affirmed the ALJ's findings that Minges had committed unprofessional conduct under K.A.R. 102-3-12a(b)(10), (b)(14), (b)(38), and (b)(52) in four separate complaints. The Board reversed the ALJ's findings of unprofessional conduct under several other subsections because that specific conduct had not been charged in the petition in discipline.

Minges appealed the Board's decision to the district court. After hearing oral argument from the parties, the district court affirmed the Board's ruling in part, finding that substantial evidence supported a finding that Minges had demonstrated unprofessional conduct as alleged in three of the four complaints filed against her. Minges timely appeals.

ANALYSIS

The Board is an administrative agency, so we review its decisions based on the standards set out in the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. See K.S.A. 2019 Supp. 74-5310. The KJRA provides eight bases for a court to grant relief from an agency's action, but Minges only alleges that two of them apply here. See K.S.A. 77-621(c).

First, Minges contends the Board's conclusions are not adequately supported by evidence that is substantial when viewed in light of the record as a whole. See K.S.A. 77-621(c)(7). "[I]n light of the record as a whole" is defined to include the evidence both supporting and detracting from an agency's finding. K.S.A. 77-621(d); see *Sierra Club v. Moser*, 298 Kan. 22, 62, 310 P.3d 360 (2013) (courts must now determine whether evidence supporting agency's factual findings is substantial when considered in light of all the evidence). Substantial evidence refers to legal and relevant evidence that a

3

reasonable person could accept as being adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). In reviewing the evidence in light of the record as a whole, courts shall not reweigh the evidence or engage in de novo review. K.S.A. 77-621(d).

Second, Minges argues that the Board's actions were arbitrary, capricious, or otherwise unreasonable. See K.S.A. 77-621(c)(8). The arbitrary and capricious test of K.S.A. 77-621(c)(8) relates to whether a particular action should have been taken or is justified, such as the reasonableness of an agency's exercise of discretion in reaching a determination or whether the agency's action is without foundation in fact. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010).

An appellate court exercises the same statutorily limited review of the agency's action as the district court. It is as though the appeal had been made directly to the appellate court. *In re Tax Appeal of Fleet*, 293 Kan. 768, 776, 272 P.3d 583 (2012); *Carlson Auction Service, Inc. v. Kansas Corporation Comm'n*, 55 Kan. App. 2d 345, 349, 413 P.3d 448 (2018). Minges, as the party asserting the invalidity of the Board's actions, bears the burden of proving invalidity. See K.S.A. 77-621(a)(1); *Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 953, 335 P.3d 1178 (2014).

The Kansas Legislature has charged the Board with the duty to ensure the continuing competence of its licensees for the protection, safety, and well-being of the public. See K.S.A. 65-5801 et seq. To carry out this duty, the Board necessarily has authority over persons engaged in the practice of professional counseling in Kansas. See K.S.A. 74-7507(a)(1); K.S.A. 65-5803. By statute, the Board has authority to "condition, limit, revoke or suspend a license, [to] publicly or privately censure a licensee or [to] impose a fine not to exceed $1,000 per violation . . ." if a licensee is "found to have engaged in unprofessional conduct as defined by applicable rules and regulations adopted by the board." K.S.A. 65-5809(a)(9).

4

The Board's regulations define unprofessional conduct in several ways. See K.A.R. 102-3-12a(b)(1)-(56). Relevant to this appeal, the district court affirmed the Board's findings that Minges engaged in the following unprofessional conduct:

- K.A.R. 102-3-12a(b)(10): "[O]ffering to perform or performing professional counseling, assessments, consultations, or referrals clearly inconsistent or incommensurate with one's training, education or experience or with accepted professional standards";
- K.A.R. 102-3-12a(b)(14): "[F]ailing to provide each client with a description of what the client can expect in the way of services, consultation, reports, fees, billing, and therapeutic regimen or schedule, or failing to reasonably comply with the description"; and
- K.A.R. 102-3-12a(b)(38): "[M]aking or filing a report that one knows to be false, distorted, erroneous, incomplete, or misleading."

The district court also affirmed the Board's finding that Minges' conduct was unprofessional under K.A.R. 102-3-12a(b)(52) by "practicing professional counseling or clinical professional counseling in an incompetent manner." But Minges does not challenge this finding on appeal, so we need not consider it. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (issue not briefed is deemed waived or abandoned).

The unprofessional conduct at issue relates to three of the four complaints filed against Minges in 2014 and 2015. The names of the individuals who filed the complaints are subject to a protective order, so the district court referred to them using these identifiers: (1) Sierra (case No. 15-PC-0006), (2) Papa (case No. 15-PC-0101), and (3) Whiskey (case No. 16-PC-0054). We address each complaint separately.

5

1. *Sierra complaint*

M. Sierra (Mother) filed a complaint against Minges in 2014. The relevant portions of Mother's complaint include the following facts. In January 2014, Mother hired Minges to work with her three-year-old daughter, who was having behavioral issues at daycare. Mother had several concerns about her early interactions with Minges and felt that if her daughter continued to see Minges, Mother's relationship with her ex-husband (Father) could become contentious. On February 20, 2014, Mother told Minges that Mother wanted to terminate Minges' services because Mother and Minges did not communicate well. Minges advised Mother that it was impossible for Mother to terminate without Father's agreement, so Mother agreed to have her daughter participate in six sessions. During a meeting with Mother, Father, and their parent coordinator, Minges announced to the group that Minges had diagnosed Mother with borderline personality disorder. Minges gave Father a book for spouses of individuals with borderline personality disorder. When Mother would ask how her daughter was doing in therapy, Minges advised that this information was confidential and could not be shared. At Father's request, Minges later issued a "'Medical Necessity Report'" diagnosing the daughter with mixed disorder of emotional expressiveness. Minges advised that she had to provide a diagnosis if a third-party payor—like an insurance company—financially contributed to the fees she charged for providing services to a patient. Mother expressed concern that Minges improperly labeled her daughter with a disorder solely for the purpose of obtaining insurance payments.

The Board found, and the district court agreed, that Minges' actions as detailed above established unprofessional conduct in violation of K.A.R. 102-3-12a(b)(10) and (b)(38). On appeal, Minges argues that the Board's findings of unprofessional conduct under K.A.R. 102-3-12a(b)(10) and (b)(38) are not supported by substantial evidence in light of the record as a whole and are otherwise unreasonable, arbitrary, and capricious.

6

a. *K.A.R. 102-3-12a(b)(10)*

K.A.R. 102-3-12a(b)(10) defines unprofessional conduct as "offering to perform or performing professional counseling, assessments, consultations, or referrals clearly inconsistent or incommensurate with one's training, education or experience or with accepted professional standards." After hearing all the testimony and considering all the evidence presented at the administrative hearing, the ALJ concluded, in relevant part, that Minges had violated K.A.R. 102-3-12a(b)(10) by rendering a diagnosis of borderline personality disorder as to Mother, who was not her client, without administering any tests. The Board adopted and incorporated the ALJ's conclusion and discussion into the final order.

Relying on her own testimony at the administrative hearing, Minges argues there is substantial evidence to support a conclusion that she did not render a formal diagnosis as to Mother. Minges complains that the ALJ gave more weight to Mother's testimony than to hers. Minges also claims the Board's finding that she rendered a diagnosis as to Mother was unreasonable, arbitrary, and capricious because Mother was not Minges' client, Minges did not provide any treatment or administer any tests to Mother, and Minges denied making such a diagnosis.

Under K.S.A. 77-621(d), we must consider the evidence both supporting and detracting from an agency's finding in determining whether the evidence supporting the agency's factual findings is substantial. *Sierra Club*, 298 Kan. at 62. To that end, we consider testimony from both Minges and Mother.

Minges testified at the hearing that the Sierra case was challenging, and that Mother had trouble regulating her emotions. According to Minges, the discussion about borderline personality disorder arose after Mother said that another therapist had diagnosed her with narcissistic personality disorder. Minges characterized the discussion

7

with Mother about borderline personality disorder as merely explaining the symptoms that Minges had observed:

> "I prefaced it by saying, I'm not saying that you have this condition, but I am saying I am noticing several things that I feel like it would be helpful for you to meet with an individual therapist for a thorough evaluation to determine if that's actually what could help explain these things that I had noticed."

Minges testified that she believed Mother's condition was impacting their working relationship, as well as Mother's relationship with her daughter. Minges also testified that she made clear to Mother that she was not rendering a formal diagnosis and that Mother was not her client. The ALJ asked Minges if she had used the term "'borderline personality disorder'" with Mother. Minges replied, "I said that . . . some of the symptoms I noticed were also symptoms of that condition." Minges admitted to giving Father a book for spouses of individuals with borderline personality disorders as a resource to help with the "challenges that he had in needing to coparent with [Mother]." But Minges claimed that she was "in no way saying [Mother] has this condition" and denied that she had ever treated Mother.

Mother recounted an entirely different interpretation of the facts. Mother testified that before their meeting with Father and the parent coordinator, Minges called to give Mother a "heads-up." Mother thought that they would talk about her daughter; instead, during the 45-minute phone call, Minges "diagnosed [Mother] with having borderline personality disorder" and advised her to find a counselor to talk to. Minges later repeated this diagnosis during their meeting with Father and the parent coordinator. Mother denied that she was a patient of Minges', that she ever intended to be Minges' patient, or that Minges had ever conducted any testing on her before giving the diagnosis. Mother also testified that Minges gave Father a book for spouses of individuals with borderline personality disorder.

Minges complains that the ALJ gave more weight to Mother's testimony than hers. Under the KJRA, we must consider all relevant evidence but cannot reweigh the evidence or engage in de novo review. See K.S.A. 77-621(d). The ALJ observed both Minges and Mother at the administrative hearing, considered and weighed their conflicting testimony, and ultimately rejected Minges' denial that she did not render a formal diagnosis as to Mother.

Substantial evidence supports the Board's conclusion that, without administering any tests, Minges rendered a diagnosis of borderline personality disorder as to Mother, who was not her client. As a result, the Board properly determined that Minges exceeded the scope of her license and violated K.A.R. 102-3-12a(b)(10) by performing professional counseling services inconsistent with her training, education, experience, or outside the scope of professional standards. Because there is substantial evidence to support the Board's finding of unprofessional conduct under K.A.R. 102-3-12a(b)(10), the Board did not act in an unreasonable, arbitrary, or capricious manner.

b. *K.A.R. 102-3-12a(b)(38)*

K.A.R. 102-3-12a(b)(38) defines unprofessional conduct as "making or filing a report that one knows to be false, distorted, erroneous, incomplete, or misleading." The ALJ found that Minges violated K.A.R. 102-3-12a(b)(38) by preparing a "false, baseless, and erroneous diagnosis of [the Sierras' child] when requested by one parent merely for an insurance medical necessity finding despite being retained to provide private p[l]ay therapy for the child." The Board adopted and incorporated the ALJ's conclusion and discussion into the final order.

Minges argues that the Board's finding is not supported by substantial evidence because there is no evidence to show that she filed a report she knew to be false or misleading. Minges notes that the district court placed great weight on the fact that she

9

rendered a diagnosis of the Sierras' child without consultation with a clinical supervisor. But Minges suggests that the court erroneously conflated issues relating to the scope of her licensure with filing a false report, claiming that nothing in the report was false.

At the administrative hearing, Mother testified that Minges refused to respond to her requests for information about her daughter's progress in therapy. After Father and his attorney asked Minges to prepare a report on the child's progress, Minges issued a medical necessity report that diagnosed the child with "mixed disorder of emotional expressiveness." According to Mother, Minges explained that she had given the child a diagnosis because one was required for insurance. Mother asked if Minges would give a diagnosis solely for insurance, even if the diagnosis was not deserved. Minges responded that she had given the diagnosis because Father had requested it for insurance purposes. Mother testified that she did not authorize Minges to run a full battery of tests on her daughter and did not believe that she ever authorized Minges to make a diagnosis.

Minges did not testify about the medical necessity report or otherwise dispute Mother's testimony about her reason for issuing the report. Minges also did not claim to have tested the Sierras' child in order to render a diagnosis. Minges did, however, testify that she was familiar with the regulations and statutes relating to her profession as an LPC, including the requirement that she was not allowed to practice independently without the supervision of a clinical level professional. See K.S.A. 65-5802(g) (defining an LPC as person engaging in practice of professional counseling "only under the direction of a licensed clinical professional counselor, a licensed psychologist, a person licensed to practice medicine and surgery or a person licensed to provide mental health services as an independent practitioner and whose licensure allows for the diagnosis and treatment of mental disorders"). Minges' claim that she did not knowingly provide false information in the report is disingenuous given her responsibility to know the scope of her licensure. Minges does not allege that the report at issue was made under the supervision of a clinical level professional, nor is there any indication in the record that it

was. Because Minges included a diagnosis in her report that she was not qualified to make and was made with no relevant testing, substantial evidence supports the Board's finding that Minges knowingly made or filed a report containing false, distorted, erroneous, or misleading information under K.A.R. 102-3-12a(b)(38).

Minges also claims that the Board's finding in this regard was unreasonable, arbitrary, and capricious. Minges notes that the district court, in support of its conclusion that she violated K.A.R. 102-3-12a(b)(38), cited to the ALJ's statement that Minges had violated K.A.R. 102-3-12a(b)(1), a subsection of the regulation that she was not charged with violating.

Minges' argument is misplaced. The district court did cite to the ALJ's statement that Minges had "blatantly failed to practice under the direction of a clinical level supervisor as required by K.A.R. 102-3-12a(b)(1)." But it appears that the ALJ's reference to K.A.R. 102-3-12a(b)(1) was in error. See K.A.R. 102-3-12a(b)(1) (defining unprofessional conduct under this subsection as "[o]btaining or attempting to obtain a license or registration for oneself or another by means of fraud, bribery, deceit, misrepresentation, or concealment of a material fact"). Instead, the ALJ presumably was referring to K.A.R. 102-3-12a(b)(10), a subsection of the regulation that Minges was charged with violating. This interpretation is supported by the fact that Minges was never charged with violating, or found to have violated, K.A.R. 102-3-12a(b)(1). The Board's petition in discipline alleged four violations of unprofessional conduct under K.A.R. 102-3-12a(b)(10), (b)(14), (b)(38), and (b)(52). Following the administrative hearing, the ALJ found that Minges had violated these provisions, in addition to K.A.R. 102-3-12a(b)(9), (b)(11), (b)(23), (b)(27), (b)(34), (b)(36), and (b)(45). The Board affirmed the ALJ's findings of unprofessional conduct under K.A.R. 102-3-12a(b)(10), (b)(14), (b)(38), and (b)(52), but reversed the ALJ's findings as to the additional provisions because those violations were not charged in the petition in discipline. The district court later affirmed a

majority of the Board's findings under K.A.R. 102-3-12a(b)(10), (b)(14), (b)(38), and (b)(52).

As earlier stated, Minges was not allowed to practice independently without the supervision of a clinical level professional. See K.S.A. 65-5802(g). There is no indication that she filed the report at issue in consultation with, or under the supervision of, a clinical level professional. Therefore, the district court's citation to the ALJ's finding that Minges had "blatantly failed to practice under the direction of a clinical level supervisor" to support the conclusion that Minges had knowingly made or filed a report containing false, distorted, erroneous, or misleading information under K.A.R. 102-3-12a(b)(38) was not unreasonable, arbitrary, or capricious.

2. *Papa complaint*

G. Papa (Father) filed a complaint against Minges in 2015. Father alleged, in relevant part, that Minges had agreed to provide his daughter with an assessment followed by eight weekly group therapy sessions. According to Father, Minges cancelled all but one session during a two-month period, and the one group session his daughter attended included only one other participant. Father also complained that Minges refused to provide a refund for the remaining seven sessions.

The Board found, and the district court agreed, that Minges' actions detailed above established unprofessional conduct in violation of K.A.R. 102-3-12a(b)(10) and (b)(14). On appeal, Minges argues that the Board's finding of unprofessional conduct under K.A.R. 102-3-12a(b)(14) is not supported by substantial evidence in light of the record as a whole and that the Board's finding of unprofessional conduct under K.A.R. 102-3-12a(b)(10) was unreasonable, arbitrary, and capricious.

12

a. *K.A.R. 102-3-12a(b)(14)*

K.A.R. 102-3-12a(b)(14) defines unprofessional conduct as "failing to provide each client with a description of what the client can expect in the way of services, consultation, reports, fees, billing, and therapeutic regimen or schedule, or failing to reasonably comply with the description." The ALJ concluded that Minges violated K.A.R. 102-3-12a(b)(14) by "failing to provide the client with an accurate description of what the client could expect in the way of service and then failing to comply with the description." The Board adopted and incorporated the ALJ's conclusion and discussion into the final order.

At the administrative hearing, Father testified that his 17-year-old daughter, M.P., suffered from depression and had attempted suicide in September 2014. Following her suicide attempt, M.P. completed a 60-day stay at a residential treatment facility and upon discharge needed to follow-up with both group and individual therapy. In November 2014, M. Papa (Mother) contacted Minges about providing group therapy for M.P. According to Father, Minges told Mother that she had a group therapy session for teenagers. Minges explained that except for holiday weeks, there would be weekly "group sessions with multiple participants and that there would be some skills training as part of the group therapy." Father testified that Minges never told them exactly how many individuals would be in the group sessions, but that they "were led to believe that there would be multiple people." The Papas paid Minges $320 in advance for the eight group sessions, or $40 for each session.

Father testified that M.P. was scheduled to start her first therapy session in early December 2014, but Minges cancelled the session with less than 24 hours' notice because the other participant could not attend. No other group sessions were scheduled in December, including the week of Christmas. Minges scheduled a group session for January 6, 2015, but later cancelled it due to inclement weather. Minges held the first

13

group session on January 13, 2015. The group consisted of M.P. and only one other individual. Father expressed disappointment that they had waited six weeks for a group session that included only two individuals, one of them being his daughter. The next group session was planned for January 20, 2015, but Minges cancelled the session due to illness. At that point, the Papas terminated Minges' services. Father testified, "[I]t was my belief we were never going to get the therapy that we were promised from Sara Minges and my daughter came off of a life-threatening mental illness incident. We needed more immediate care than Sara had promised and not provided." Minges refused to reimburse the Papas for the remaining seven sessions for which they had paid.

Minges testified that when Mother first contacted her about providing group therapy for M.P., she responded that she did not have any groups active at that time. Soon after, Minges received another request for teen group therapy. Minges said that her groups tended to be very small, consisting of only two to five individuals, so she contacted Mother to complete an intake assessment for M.P. Minges claimed that as part of the intake assessment, she discussed with Mother her billing and cancellation policies and that Mother understood them.

When Mother asked how many people were signed up for M.P.'s group, Minges said she advised that one other individual had signed up and that she was actively recruiting others. Minges said that while she could not guarantee how many people would be in the group, "several other people" had requested to join the group and planned to attend. Minges testified, "I think there was an email correspondence between myself and [Father] where I did say that several other people have requested to join the group at that time." According to Minges, the one group session attended by M.P. on January 13, 2015, went "really well." Minges said that she had remained willing to provide additional group therapy for M.P. and to recruit additional members for the group, but she was unable to do so because Father chose to terminate her services.

Minges argues that the Board's finding of unprofessional conduct under K.A.R. 102-3-12a(b)(14) is not supported by substantial evidence. Minges claims that she provided Mother with a description of her services and notes that three of the four scheduled therapy sessions were cancelled due to other participants cancelling, inclement weather, and illness. Minges also asserts that there is no foundation for Father's belief that more than two people would participate in group therapy because she never spoke to him.

In light of the record as a whole, substantial evidence supports a finding that Minges told the Papas that they could expect for M.P. to receive group therapy and skills training that included multiple participants and that Minges did not reasonably comply with this description of her services. After M.P. was released from 60 days of residential treatment following a suicide attempt, the Papas sought immediate follow-up group therapy for M.P. in November 2014. Although Minges was aware of M.P.'s vulnerable state, there was a six-week delay from the time Minges agreed to provide group therapy to when the first group therapy session was held in January 2015. And Minges offered group therapy to M.P. without disclosing to the Papas that no actual group had been formed. Minges testified that her groups tended to be small and included anywhere from two to five individuals, but she also admitted to telling the Papas that she was recruiting others to join the group therapy sessions and to e-mailing Father that "several other people" had requested to join them. Minges' representations to the Papas about "group" therapy were, at best, misleading. The Board's finding of unprofessional conduct under K.A.R. 102-3-12a(b)(14) is supported by substantial evidence.

b. *K.A.R. 102-3-12a(b)(10)*

K.A.R. 102-3-12a(b)(10) defines unprofessional conduct as "offering to perform or performing professional counseling, assessments, consultations, or referrals clearly inconsistent or incommensurate with one's training, education or experience or with

accepted professional standards." The ALJ concluded, in relevant part, that Minges had violated K.A.R. 102-3-12a(b)(10) by "offering to perform professional counseling and then performing in a manner clearly inconsistent with one's training, education, experience, and accepted professional standards." In support of this conclusion, the ALJ noted that Minges had "contracted to provide eight peer group therapy sessions for a prepayment of $320. Eight weeks later, she had provided only one session with one other teenage girl. She never provided a group therapy session but refused to refund the unearned payment, even to the date of the hearing." The Board adopted and incorporated the ALJ's conclusion and discussion into the final order.

Minges contends that the Board's finding of unprofessional conduct under K.A.R. 102-3-12a(b)(10) was unreasonable, arbitrary, and capricious. Minges claims that in affirming the Board's finding, the district court erroneously deferred to the Board and that the ALJ, the Board, and the district court failed to consider all the relevant evidence. Specifically, Minges asserts they failed to consider that (1) Father never met or talked to Minges before testifying at the administrative hearing, (2) the $320 advance payment was nonrefundable, (3) Mother did not tell Father that prepayment was required for group therapy, (4) Mother acknowledged in an e-mail that she agreed to pay for the therapy sessions in advance, (5) Mother understood Minges' cancellation policy, (6) the one group session M.P. attended "went very well," (7) Father, not Minges, terminated her services and refused to allow M.P. to participate in any additional group therapy sessions, and (8) Minges responded to Father's complaint in a timely manner.

In affirming the Board's determination that Minges' conduct was unprofessional under K.A.R. 102-3-12a(b)(10), the district court cited the Board's conclusion that "Minges' services were performed in a manner clearly inconsistent with the training, education, experience and accepted professional standards of a Licensed Professional Counselor." The court noted that the Board was an expert in matters involving the standard of care of its licensees. The court stated:

16

"In deciding whether Ms. Minges committed unprofessional conduct, the [ALJ] would have had to evaluate Minges' interactions with the Papa's as compared to the usual and customary standard practice used by a reasonable and prudent LPC. . . .

. . . .

". . . [G]iven the nature of the [Board]'s expertise in matters involving the standard of care of its license[e]s, this Court finds deference should be given to the [Board]'s determination. . . .

. . . .

". . . The [ALJ] clearly did not believe Ms. Minges' conduct complied with accepted professional standards expected of a Licensed Professional Counselor. The [ALJ] also found Ms. Minges' conduct did not meet the accepted standard of practice for a Licensed Professional Counselor as to fair and appropriate restitution/reimbursement for fees paid but not earned."

Contrary to Minges' assertion, the district court's analysis did not end there. The court also cited the scope of review under the KJRA, including the definition of "in light of the record as a whole." See K.S.A. 77-621(d) (defining "in light of the record as a whole" to include evidence both supporting and detracting from agency's finding). The court then viewed the evidence in light of the record as a whole and determined that substantial evidence supported the Board's conclusion that Minges' conduct was unprofessional under K.A.R. 102-3-12a(b)(10).

Minges' claim that the ALJ, the Board, and the district court ignored or failed to consider all the relevant evidence is not supported by the record. Moreover, this argument is essentially an invitation to reweigh the evidence, which we cannot do. See K.S.A. 77-621(d). Minges has failed to show that the Board's finding of unprofessional conduct under K.A.R. 102-3-12a(b)(10) was unreasonable, arbitrary, or capricious. Minges' claim of error on this point necessarily fails.

17

3. *Whiskey complaint*

K. Whiskey, a provisionally licensed marriage and family therapist in Missouri, filed a complaint against Minges in December 2015. Whiskey said that she had professional concerns about Minges based on a personal experience. Whiskey explained that she had attended an emergency court hearing in Ottawa, Kansas, in support of her sister, who was involved in a child custody case. The hearing related to whether supervised visitation should continue between Whiskey's niece (the child) and the child's father (Father), due to Father's behavior. Father hired Minges to testify on his behalf at the hearing. Whiskey alleged that Minges had never met Father in person before testifying at the hearing and, as a result, lacked sufficient information to make any recommendations. According to Whiskey, Minges reported to the court that Father had hired her as the child's therapist. Whiskey advised that Father did not have custodial rights to the child, so Minges could not be hired as a therapist without permission from the child's mother (Mother). Whiskey reported that Mother had not granted this permission. Whiskey said that Minges had, at Father's request, left a message for Mother in an attempt to initiate therapy services for the child. At the time, Father was under a court order not to have any contact with Mother. Finally, Whiskey advised that Minges had testified at the hearing that it was "'crucial'" for supervised visitation between Father and the child to continue. Whiskey expressed concern that Minges lacked sufficient information to make this recommendation yet had presented herself as an expert witness.

The Board found that Minges' actions detailed above established unprofessional conduct in violation of K.A.R. 102-3-12a(b)(10) and (b)(38). The district court reversed the Board's finding that Minges' conduct was unprofessional under K.A.R. 102-3-12a(b)(10) but affirmed the Board's finding under K.A.R. 102-3-12a(b)(38).

On appeal, Minges argues that the Board's findings of unprofessional conduct under K.A.R. 102-3-12a(b)(10) and (b)(38) are not supported by substantial evidence and

18

are otherwise arbitrary, capricious, and unreasonable. But the district court reversed the Board's finding of unprofessional conduct under K.A.R. 102-3-12a(b)(10). As a result, we need only address Minges' arguments as they relate to K.A.R. 102-3-12a(b)(38).

K.A.R. 102-3-12a(b)(38) defines unprofessional conduct as "making or filing a report that one knows to be false, distorted, erroneous, incomplete, or misleading." The ALJ found that Minges had violated K.A.R. 102-3-12a(b)(38) as follows:

> "[Minges] had no basis upon which to form an opinion as to visitation or custody and was incompetent to provide forensic testimony on that subject under oath to the court. She learned the day of the hearing that the child's father who had hired her had alcohol and anger management problems and there was a restraining order against him by the child's mother on behalf of the mother and child. Nevertheless, [Minges] proceeded to opine on her recommendation for weekly visitation in violation of the court order. [Minges] testified in court and provided a recommendation for supervised visitation of a child without conducting even the most minimal assessment of the child's needs. Therefore, [Minges] provided a false, distorted, erroneous, incomplete, and misleading report, *under oath*."

The Board adopted and incorporated the ALJ's conclusion and discussion into the final order.

The Franklin County hearing at issue was held in December 2015. Minges testified about her credentials as an LPC and her experience as a play therapist. Minges explained that she worked with both children and adults and identified herself as a trauma and relationship expert. Minges said that Father had contacted her to provide services for his daughter and that during the previous 10 months, she had provided e-mail and phone support to Father for his stress and emotions. Minges testified that during that time, she had about 10 phone conversations with Father, in addition to extensive e-mail communication.

19

When asked about Father's behavior, Minges testified that she had reviewed Father's medical reports and supported the findings in those reports that Father had "features of narcissism." Minges explained that this diagnosis included "difficulties in managing your emotions appropriately" and involved "extreme anger, irritability." Minges also testified that Father loved his daughter very much and was angry over not having contact with her. Minges said that she had discussed with Father the importance of learning different ways to cope with his stress. Minges recommended that Father see an individual therapist to help him process his feelings of frustration over not seeing his daughter, as well attend a skills training group to learn and receive feedback about conflict resolution and different ways to cope and manage his intense emotional responses to certain situations. Minges also recommended that Father have visitation with the child. Minges noted that while she had not yet met the child, it was "extremely crucial" that children of that age have "regular consistent contact" with both parents. To that end, Minges stated that while she would not recommend unsupervised visitation between Father and the child,

> "[w]hat I believe would be helpful for [the child] would be able to have regular weekly one hour visits between [the child and Father], and when he can demonstrate that he's following through with therapy recommendations and he can demonstrate that he is improving his ability to manage stress and to manage his emotions in an appropriate manner to increase the length of time of those visits."

Minges suggested that she had been hired to work with the child and testified that she was "uniquely trained" to supervise visitations and to help the child have "good positive relationships with both parents." When asked whether Father should attend therapy before beginning visitation, Minges replied,

> "No. I think she could have supervised visits with him right now. It's been so long since they've had that I'd like to see that continue but I would like to see that in supervised situation and for one hour a week because I want to make sure we're

20

maintaining because it can take a while to repair attachment relationships. So since those visits have started I think it would be great if we could still do those, supervised visitation."

Minges argues no evidence supports the Board's finding that her testimony at the Franklin County hearing was false, distorted, incomplete, or misleading. Minges specifically challenges the Board's finding that she had no basis to form an opinion about visitation, noting that she had participated in approximately 10 phone calls with Father and that the Franklin County judge had allowed her to testify at the hearing, over the objection of Mother's attorney. Minges also disputes that she presented herself as an expert at the hearing, claiming the Franklin County judge specifically found that she was not an expert witness. And Minges asserts that she was never aware of the restraining order against Father.

Minges' arguments are unpersuasive and unsupported by the record. That the Franklin County judge allowed Minges to testify at the hearing is hardly evidence of her competence to do so. Moreover, the judge's determination that she was not qualified to present expert testimony did not stop Minges from holding herself out as one. Indeed, Minges testified that she was "uniquely trained" to supervise visitations and to help the child have "good positive relationships with both parents" because of her experience as a foster care worker and skills training facilitator. And despite never meeting the child or observing any interactions between Father and the child, Minges expressed her belief that one-hour weekly visits with Father would benefit the child. Minges testified at the administrative hearing that it was not her intent to give a recommendation about visitation between Father and the child; instead, she claimed that she was speaking generally to the benefits of a child that age having a positive healthy relationship with both parents. But Minges admitted she could see how it might appear that she was giving a recommendation and agreed that when she was asked for her recommendation, she responded that Father and the child should have weekly one-hour visits. Minges further

21

admitted that when she gave this recommendation, she knew that Father had issues with substance abuse and anger management and that he had a protective order in place against him. Viewed in light of the record as a whole, substantial evidence supports the Board's finding that Minges' testimony constituted unprofessional conduct under K.A.R. 102-3-12a(b)(38).

Minges asserts that the Board's finding under K.A.R. 102-3-12a(b)(38) was otherwise unreasonable, arbitrary, and capricious because it was based on a false allegation that Minges had never met Father in person and an erroneous conclusion that she had provided expert testimony at the Franklin County hearing. Minges also notes that the complaint had nothing to do with her treatment of Father, who was her client.

But the Board's finding was not based on the fact that Minges had not met Father in person or that Minges had provided expert testimony at the Franklin County hearing. Rather, the Board's finding was based on Minges' testimony that recommended supervised visitation between Father and the child (1) without conducting any assessment of the child's needs and (2) despite knowing that Father had issues with substance abuse and anger management and had a protective order in place against him. Moreover, a finding of unprofessional conduct under K.A.R. 102-3-12a(b)(38) is not limited to an LPC's treatment of a client. Minges' testimony at the Franklin County hearing certainly qualifies as making a false, distorted, erroneous, incomplete, or misleading report. See K.A.R. 102-3-12a(b)(38). The Board's finding in this respect was not unreasonable, arbitrary, or capricious.

Affirmed.

22